IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TED SMITH,                          )
                                    )
                    Plaintiff,      )
                                    )
        -versus-                    )        Civil Action No.: 1:05CV00577
                                    )
JO ANNE B. BARNHART,                )
Commissioner of Social Security,    )
                                    )
                    Defendant.      )

## ORDER AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Ted Smith, brought this action pursuant to Sections 205(g) and
1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) and
1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social
Security denying his claims for Disability Insurance Benefits and Supplemental
Security Income under, respectively, Titles II and XVI of the Social Security Act (the
"Act").[1] Plaintiff has filed several motions, Defendant has filed a motion for summary
judgment, and the administrative record has been certified to the court for review.

---

[1]    The Social Security Disability Insurance Program was established by Title II of the
Act, 49 Stat. 622 (codified at 42 U.S.C. § 401 et seq.), and the Supplemental Security
Income Program was established by Title XVI of the Act, 86 Stat. 1465 (codified at 42
U.S.C. § 1381 et seq.).

**Procedural History**

Plaintiff filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on November 15, 2000 (protective filing date, October 31, 2000), alleging a disability onset date of March 31, 1993.[2] Tr. 178, 398. The applications were denied initially and upon reconsideration. Tr. 153-54; 401, 406. Plaintiff requested a hearing de novo before an Administrative Law Judge (ALJ). Tr. 165. Present at the hearing, held on August 20, 2002, were Plaintiff, his attorney, his wife, and a psychological consultant. Tr. 413.

By decision dated December 13, 2002, the ALJ determined that Plaintiff was not disabled within the meaning of the Act. Tr. 466. On June 25, 2004, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 10), thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review.

In deciding that Plaintiff is not entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

> 1. The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 1998, but not thereafter.

---

[2] Plaintiff had previously filed an application for DIB on May 27, 1997, alleging the same disability onset date of March 31, 1993. Tr. 54. The application was pursued through review by the Appeals Council, which declined to review the ALJ's decision. See Tr. 19. That application, and related documents, have been made part of the current administrative record, but it was not reopened with the instant applications.

2

2.     The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.     The medical evidence indicates that as of December 31, 1998, the claimant had a history of low back strain, an impairment that was severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  The medical evidence of record does not establish that the claimant had a medically determinable mental impairment or a mental impairment that significantly limited his physical or mental ability to perform basic work activities as of December 31, 1998, the date he was last insured for benefits under Title II (20 CFR §§ 404.1521 and 416.921).

4.     The medical evidence indicates that the claimant currently has a history of low back strain, a history of schizophrenia, currently in remission; major depression; anxiety disorder (not otherwise specified); and obsessive-compulsive disorder, impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

5.     These medically determinable impairments, either singly or in combination, do not meet or medically equal section 12.02, 12.03, 12.04, or one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

6.     The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

7.     The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

8.     The claimant had the residual functional capacity to perform medium work as of December 31, 1998 and thereafter.

9.     The claimant was unable to perform any of his past relevant work as of December 31, 1998 and thereafter (20 CFR §§ 404.1565 and 416.965).

10.    The claimant was a "younger individual" on his date last insured. He is currently 52 years old (20 CFR §§ 404.1563 and 416.963).

11.    The claimant has "more than a high school education" (20 CFR §§ 404.1564 and 416.964).

12.    The claimant has no transferable skills from any past relevant work (20 CFR §§ 404.1568 and 416.968).

13.    The claimant had the residual functional capacity to perform substantially all of the full range of medium work as of December 31, 1998 and thereafter (20 CFR §§ 404.1567 and 416.967).

14.    Based on an exertional capacity for medium work, and the claimant's age, education, and work experience, Medical-Vocational Rules 203.29 and 203.22, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

15.    The claimant's capacity for medium work is substantially intact and was not compromised by any nonexertional limitations as of December 31, 1998 and thereafter.  Accordingly, using the above-cited rules as a framework for decision-making, the claimant was not disabled on December 31, 1998 or thereafter.

16.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

Tr. 481-82.

### Analysis

In his "letter motion" (Pleading no. 11),[3] Plaintiff argues the Commissioner's

findings are in error because the ALJ mistakenly (1) relied upon the assessment of

---

[3]    Plaintiff filed no briefs to accompany his "motions," but the court is required to liberally construe pro se documents, Estelle v. Gamble, 429 U.S. 97 (1976), holding them to a less stringent standard than those drafted by attorneys, Hughes v. Rowe, 449 U.S. 9 (1980) (per curiam).

4

a consultant who was not qualified; (2) failed to appreciate the severity of Plaintiff's back impairment; (3) relied on the report of a treating doctor; (4) discounted the opinion of a consultant; and (5) neglected to consider all of his impairments. The Commissioner contends otherwise and urges that substantial evidence supports the determination that Plaintiff was not disabled.

Scope of Review

The Act provides that, for "eligible"[4] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, the Social Security Administration ("SSA"), by regulation, has reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must determine whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Act's "Listing of Impairments,"[5] (4) has an impairment which prevents past relevant work,

---

[4]  Eligibility requirements for DIB are found at 42 U.S.C. § 423(a)(1), and for SSI at 42 U.S.C. § 1382(a).

[5]  The listings set out at 20 C.F.R. Part 404, Subpart P, Appendix 1, are descriptions of various physical and mental illnesses and abnormalities, most

(continued...)

5

and (5) has an impairment which prevents him from doing any other work. 20 C.F.R. §§ 404.1520 and 416.920.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. Richardson v. Perales, 402 U.S. 389 (1971); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Pyles v. Bowen, 849 F.2d 846, 848 (4th Cir. 1988) (citing Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986)); see also Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (the issue before the court is not whether the claimant is disabled, but whether the ALJ's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law).

Substantial evidence is:

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is

---

[5](...continued)
of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.
Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990) (footnotes omitted).

6

> evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

Pertinent Evidence Presented

As of the date of the ALJ's decision, Plaintiff was fifty-two years of age. See Tr. 470. The ALJ found that he has more than a high school education and past relevant work as a meat cutter. According to the ALJ, Plaintiff initially alleged disability due to back problems, depression, and anxiety.

The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. He also determined that Plaintiff met the disability insured status requirements of the Act through December 31, 1998, but not thereafter.

The ALJ discussed Plaintiff's past filing history. See Tr. 469. Of relevance here, Plaintiff filed a previous disability application on May 27, 1997, alleging the same onset of disability as with the present applications – March 31, 1993. See also

7

Tr. 54. After his application was denied initially and upon reconsideration, <u>see</u> Tr. 35-36, Plaintiff requested a hearing before an ALJ, Tr. 47, but subsequently declined to make a personal appearance, Tr. 53. After the ALJ found him not disabled, <u>see</u> Tr. 23-33, Plaintiff requested review by the Appeals Council, which declined review, Tr. 19.

The effect of the earlier decision was to decide all issues with finality through the date of the decision – July 27, 1998. The principle of "res judicata" precludes the assertion of a claim after a judgment on the merits in a prior suit by parties based on the same cause of action. <u>See</u> <u>Meekins v. United Transp. Union</u>, 946 F.2d 1054, 1057 (4th Cir. 1991). Accordingly, the "relevant period" for this case, in terms of Plaintiff's DIB application, is only July 28, 1998, through December 31, 1998, the date he was last insured under Title II of the Act ("DLI").

Moreover, a claimant may not receive SSI benefits until the first month after he has filed his application, assuming that the other statutory requirements are satisfied; benefits are not payable for any period prior to the filing of the application. <u>See</u> 20 C.F.R. § 416.335. As Plaintiff filed his applications with an effective date of October 31, 2000, he would not be eligible to receive any payments under Title XVI of the Act before November 2000, although his onset of disability generally would have to predate the payment of benefits by a year. <u>See</u> 42 U.S.C. § 1382c(a)(3)(A).

Accordingly, the ALJ divided his decision into two time periods. He found that, prior to December 31, 1998, the medical evidence established that Plaintiff suffered

8

from only one "severe"[6] impairment, a history of low back strain. Tr. 471. The ALJ determined that, after Plaintiff's DLI, his history of low back strain, history of schizophrenia (currently in remission), major depression, anxiety disorder (not otherwise specified), and obsessive-compulsive disorder, became severe. He concluded, nevertheless, that none of these impairments met or equaled any of the Listing of Impairments.

A. Motions

Before addressing Plaintiff's allegations, the court will first undertake disposition of his motions. At Pleading No. 12, Plaintiff requested that there be a hearing held in this matter. As discussed above, a court's review of SSA determinations is limited, and is generally accomplished using the record before SSA. Plaintiff has had the opportunity to present his arguments and evidence to the court in writing. Under these circumstances, a hearing is not required. Therefore, Plaintiff's motion (Pleading No. 12) is hereby DENIED.

Along with his letter motion, Plaintiff included hundreds of pages of attachments. Thereafter, he filed a motion for the court to review evidence. <u>See</u> Pleading No. 16. Plaintiff submitted two additional motions with similar requests. <u>See</u> Pleadings No. 18 ("Please consider my new evidence[.]"), and No. 21 ("motion to introduce more new evidence").

---

[6] An impairment is deemed severe only if it significantly limits a claimant's physical or mental abilities to perform "basic work activities." <u>See</u> 20 C.F.R. §§ 404.1520(c) and 416.920(c).

9

The district court generally may not consider evidence that was not before the Commissioner.  See Smith v. Chater, 99 F.3d 635, 638 n. 5 (4th Cir. 1996) (citing United States v. Carlo Bianchi & Co., 373 U.S. 709, 714-15 (1963)).  But as the court is required to liberally construe pro se documents, Estelle v. Gamble, 429 U.S. 97 (1976), it will assume that Plaintiff wishes the court to remand the case to the Commissioner in light of this additional evidence.

A reviewing court may remand a case to the Commissioner on the basis of new evidence if four prerequisites are met:

(1) the evidence must be relevant to the determination of disability at the time the application was first filed (i.e., during the relevant period);

(2) the evidence must be material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before her;

(3) there must be good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and

(4) the claimant must make at least a general showing of the nature of the new evidence to the reviewing court.

See Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985); see also 42 U.S.C. § 405(g).  Plaintiff has made the requisite showing of the nature of the "new evidence" by attaching copies to his pleadings, but he has not satisfied the other Borders requirements.

10

1.  <u>Documents Already in the Record</u>

Included with Plaintiff's submissions were the following:

⦁Records from Morehead Memorial Hospital ("Morehead") pre-dating July 28, 1998 (<u>see also</u> Tr. 137; 251-53);

⦁Records from Rockingham County Health Department (the "Clinic") from November 20, 1996, through November 28, 2001 (<u>see also</u> Tr. 264-305);

⦁Letter from Dr. Gerald Plovsky (<u>see also</u> Tr. 307);

⦁Evaluation by Dr. Stephen Levitt (<u>see also</u> Tr. 381).

These documents, as indicated, are already included in the administrative record; thus, they have been reviewed by the Commissioner. To the extent they are relevant to the issues raised herein, they will be duly considered by the court.

2.  <u>Other Documents Created Within the Relevant Period</u>

⦁From Morehead, emergency room records from September 14, 1998, regarding a complaint of lower back pain;

⦁From Rosalyn Harris-Offutt, notes from Plaintiff's consultations dated May 24, 2001, and April 12, 2002;

⦁From the Clinic, medical records for a variety of minor complaints, dated May 6, 2002, through July 8, 2002;

⦁From Eden Internal Medicine ("Eden"), records of visits dated October 2 and December 8, 2002.

11

As to each of the above, Plaintiff has offered no reason why they were not produced prior to the date of the ALJ's decision, or even with his request for review by the Appeals Council.[7]

Further, there is no showing that any of the above would have altered the ALJ's decision. Plaintiff's emergency room visit indicates that he suffered from severe back pain only "occasionally, once every 6 months or so." He could toe walk, heel walk, and squat; there was no muscle wasting; and sensation was intact into his lower extremities. Upon his visit to the Clinic, Plaintiff indicated that he experienced lower back pain only "off and on," and that over-the-counter medication helped. Not until December 8, 2002, did Plaintiff make complaints, at Eden, that his back pain radiated into his right foot, with mild numbness, and Motrin was not helping. This complaint was at the very end of Plaintiff's relevant period, and does not satisfy the requirement of a twelve-month period of disability.

Plaintiff points to a statement in his October 2, 2002, Eden record that he is "disabled because of his mental condition." This statement, however, is placed under his history, and is clearly a notation of Plaintiff's statement to the caregiver, rather than a diagnosis.

---

[7] Pursuant to 20 C.F.R. Sections 404.970(b) and 416.1476(b)(1), the Appeals Council shall consider evidence submitted with a request for review if the evidence is new, material, and "relates to the period on or before the date of the [ALJ's] hearing decision."

3.  Documents Post-Dating the Relevant Period

The following documents were all produced after December 13, 2002, the date
of the ALJ's decision:

ᐤRemaining records from Eden;

ᐤRecords from Morehead, showing that Plaintiff underwent a series of injections to address his lower back pain;

ᐤRecords from Piedmont Anesthesia and Pain Consultants, dating from August 20, 2003, detailing treatment of his back pain;

ᐤRecords from Morehead, indicating that Plaintiff suffered from pneumonia, dated March 12 through 16, 2004;

ᐤNote from Plaintiff explaining that his chronic obstructive pulmonary disease resulted from his bout of pneumonia in March 2004;

ᐤRecords from Dr. Kimberly Bird, starting April 3, 2004;

ᐤPsychological assessment performed by Dr. Julia Brannon on November 30, 2004;

ᐤRecords from Piedmont Pain Care, detailing back treatment;

ᐤNote from Nancy Faller, D.O., dated April 27, 2005, advising that Plaintiff should not stand for more than thirty minutes;

ᐤRecords from Morehead dated August 5 through 21, 2005, and September 2 through 6, 2005;

ᐤNote dated September 9, 2005, ordering an "$O_2$ setup" for Plaintiff;

ᐤNote from Ernest Hodges, PA-C, dated January 20, 2006, listing Plaintiff's physical limitations;

ᐤResults of various diagnostic studies, including an electrocardiogram (normal limits); magnetic resonance imaging studies; a stress test ("clinically equivocal"); a computed tomography of the abdomen

> (showing diverticulitis); chest x-rays (revealing the course of his pneumonia); a knee x-ray (normal limits); and sleep studies (revealing obstructive sleep apnea, moderate, and prolonged hypoxemia).

Plaintiff has not demonstrated that any of the above are either relevant to the disability determination during the relevant period or would have, if presented to the ALJ, altered his decision.

Of these records, the closest to the end of the relevant period is a record from Eden dated December 18, 2002. Plaintiff complained of back pain, but was taking nothing for pain, and his examination revealed no objective findings that would support a disabling impairment. Plaintiff's next medical record is not until February 19, 2003, when he was treated for a rash.

There is additional material, however, that, although dated after the ALJ's decision, potentially addresses Plaintiff's condition during the relevant period. Dr. W. F. Heiney, Jr., performed a psychological assessment of Plaintiff on February 12 and 18, 2003. The court dismisses this assessment, however, as Dr. Heiney found there to be "high levels of dissimulation . . . and some exaggeration," causing Plaintiff's profiles to be "spuriously high." As there is no indication that Dr. Heiney did, or even *could*, adjust his findings accordingly, the court does not see how his findings can be reliable. Moreover, as hereinafter discussed, the record during the relevant period fails to support a finding that Plaintiff was mentally disabled.

14

On May 23, 2003, Plaintiff underwent a magnetic resonance imaging of his lumbar spine. This study, however, revealed only slight disc dehydration, which would not support a disabling spinal impairment.

Dr. L. C. Dekle treats Plaintiff through Rockingham County Area Mental Health, Developmental Disabilities and Substance Abuse Services. He provided a letter, dated October 8, 2003, that states: "It has been my belief *since I have known [Plaintiff]* that he is unemployable, especially since he has chronic difficulties in dealing with the public and lacks sufficient self confidence to sustain any form of employment." (Emphasis added.) A second letter, dated December 21, 2005, contains similar assurances. These contentions, however, are not supported by the doctor's records during the relevant period, as discussed infra.

Dr. Timothy Webster provided a letter in February 2005 in which he opined that previous reports "support [Plaintiff]'s contention that he is in fact disabled from gainful employment by his varied psychiatric symptoms." But a medical expert's opinion as to the ultimate conclusion of disability is not dispositive; opinions as to disability are reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(e)(1) and 416.927(e)(1). See also Social Security Ruling (SSR) 96-5p (whether or not a claimant is disabled under the Act is not a medical issue, but rather, an administrative determination reserved to the Commissioner). Thus, SSA has provided that "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R.

15

§§ 404.1527(e)(1) and 416.927(e)(1).  As the ALJ had before him the reports upon which Dr. Webster relies, the doctor's opinion is not material to the disability decision.

Plaintiff included a description of the medications he was then taking, along with a September 24, 2005, record of his prescriptions filled by the CVS drugstore. To the extent, however, that Plaintiff was taking these medications during the relevant period, the transcript would so reflect.  <u>See, e.g.</u>, Tr. 232 ("Claimant's Medications").

Plaintiff's submissions also contain two letters from Eden's Dr. Dhruv Vyas attesting to his disability.  There is no showing, however, that these opinions relate to the relevant period, nor do the Eden records reflect any disabling conditions.  The opinion of a treating physician is accorded little weight if it is not supported by clinical evidence.  <u>See</u> <u>Craig v. Chater</u>, 76 F.3d 585, 590 (4th Cir. 1996).

Accordingly, because none of Plaintiff's post-decision submissions satisfy the <u>Borders</u> criteria, his case will not be remanded for their consideration.

B.  Plaintiff's Issues

    1.  <u>Consultant</u>

The ALJ sent Plaintiff for two psychological consultative examinations ("CE"s), performed by Dr. Stephen Levitt and Bede A. R. Pantaze.  As to Ms. Pantaze, Plaintiff objects that she

operated out of a wooden shack, wore dirty clothes, and was very unprofessional. Mr. Crumwell, who was my lawyer at the time, found out that she was not a PHD[sic] or a neuro-psychologist. Therefore, she should not have given me the tests to start with. The [ALJ] read her report he used it to turn me down for my disability.

Pleading 11 at [1].

The regulations provide, "We will purchase a consultative examination only from a qualified medical source . . . . By 'qualified,' we mean that the medical source must be currently licensed in the State and have the training and experience to perform the type of examination or test we will request[.]" 20 C.F.R. §§ 404.1519g and 416.919g. There is no requirement that the examiner have attained a particular level of education.

The ALJ admitted that Pantaze was not a psychiatrist, but explained that she was "a licensed clinical psychologist who has been found qualified by Disability Determination Services (DDS) to perform evaluations," and he found her conclusions to be supported by the record. Tr. 480. That Plaintiff disapproves of Pantaze's surroundings, appearance, or demeanor is not enough; he has failed to demonstrate that she is not licensed in the State, or that she has insufficient experience or training, as required by the regulations. Consequently, his objections are not well taken.

17

2. <u>Plaintiff's Back Impairment</u>

The ALJ also sent Plaintiff for a physical CE, and that physician performed an X-ray on Plaintiff's back. Plaintiff concedes that the findings were minimal, but argues,

> [A]fter I received Medicaid I also had an MRI done on my back. The MRI showed that I had three herniated discs. I am currently being treated for my back problems . . . . I have consultation visits once every other month and receive shots for pain in back every three months. I have been diagnosed as having an arthritic hip along with the three herniated discs.

Pleading No. 11 at [1].

Plaintiff had his back X-ray on January 24, 2001. <u>See</u> Tr. 260. The finding was "possible minimal retrolisthesis[8] of L5 on S1 with degenerative facet disease." <u>Id.</u> (footnote added). The consultative examiner found that Plaintiff got on and off of the examining table without difficulty. Tr. 258. His gait was normal and his pedal pulses were intact. Although Plaintiff could not walk on his heels, he could on his toes. He was also able to squat and stand, and used no assistive device. There was no redness, swelling, atrophy, deformity, spasm, or tenderness on exam. Tr. 258-59. Plaintiff's neurological exam was grossly intact, with motor, sensory, and reflex. Tr. 259. The examiner determined that Plaintiff had no limitations on standing or moving about, although he should not lift over thirty pounds.

---

[8] Retrolisthesis, or "retrospondylolisthesis," is a "[s]lipping posteriorly of the body of a vertebra, bringing it out of line with the adjacent vertebrae." <u>Stedman's Medical Dictionary</u> 1563 (27th ed. 2000).

Plaintiff's most recent complaint of back pain had been two years earlier, on January 27, 1999, and there is no indication that he received treatment at that time. See Tr. 301-02. After the physical CE, he next sought physical care on November 28, 2001, but did not list back pain as one of his problems. See Tr. 272. There is no record of treatment for back care throughout the remainder of the relevant period.

As previously mentioned, among Plaintiff's "new evidence," there is a record of a back complaint on May 6, 2002, but he presented testimony about this visit. See Tr. 435. Plaintiff recalled that the only treatment he received was Ibuprofen 600. His last visit before the ALJ's decision, on December 8, 2002, was also for back pain but, as discussed above, this single record does not establish that Plaintiff had a disabling back impairment. Even the May 2003 MRI, performed 5 months after the X-ray, showed only slight disc dehydration.

In finding that Plaintiff could perform medium[9] work, the ALJ concluded that, based on Plaintiff's testimony and medical records, it was "somewhat doubtful" that his low back strain was symptomatic "at all now." Tr. 480. Although Plaintiff's

---

[9] The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds.

SSR 83-10, West Soc. Sec. Rep. Serv., Rulings, 1983-1991, at 30; see also 20 C.F.R. §§ 404.1567(c) and 416.967(c).

19

condition may have greatly deteriorated after the relevant period, there is substantial evidence to support the ALJ's 2002 decision.

### 3. Treating Physician

Plaintiff objects next that the first psychiatrist he consulted "did not work for me. He would scream at me and make me feel very uncomfortable. I request[ed] to be seen by another psychologist. The first psychiatrist wrote in his report that I had a manipulative trait. The [ALJ] used this against me to turn down my case." Pleading No. 11 at [1].

Plaintiff's first mental health visit occurred on April 20, 1999, when he was seen by Dr. W. Stuart Collins. See Tr. 297. Plaintiff told Dr. Collins that he had heard "negative things about Prozac," and did not want to take it or "anything resembling it." Id. He added that he had taken Xanax which his parents had supplied, and that it made him "'less nervous.'" Id.

The doctor observed that Plaintiff's affect and speech were normal, he was oriented, and he said that he had no desire to harm himself or others. Tr. 298. He did not speak of delusions or exhibit hallucinations. Dr. Collins diagnosed Plaintiff with major depression, anxiety disorder (not otherwise specified), and obsessive-compulsive disorder traits. He prescribed Imipramine and Alprazolam.[10]

---

[10] Alprazolam is found in Xanax tablets. See Physicians Desk Reference 2655 (60th ed. 2006). It is a controlled substance under the federal Controlled Substance Act. Id. at 2658. Plaintiff has admitted to a lengthy history of substance abuse. See, e.g., Tr. 340, 381.

Dr. Collins saw Plaintiff again on May 26, 1999, and noted:

> There is a manipulative quality to Mr. Smith. He complains of the pressures in his life producing nervousness and he states he feels as if he is "falling apart." When questioned, the patient stated that he saw "moving human shapes" and sometimes "heard voices" in the distance. He stated he never could make out what was being said. He described these voices as "mumbling."
>
> I go[t] the distinct impression that the patient somehow felt that, if he gave a history such as has just been described, he stood a better chance of getting Xanax. . . .
>
> The patient states he is not receiving medicine from any other source.

Tr. 296. The doctor noted that, again, Plaintiff's speech and affect were normal. He spoke of no frank delusions and did not exhibit any hallucinations. Plaintiff expressed no desire to harm himself or others. Further, Dr. Collins noted no side effects of Plaintiff's treatment, and Plaintiff professed to sleeping better with Imipramine. The doctor discontinued the Alprazolam and added to Plaintiff's diagnoses, "Rule out malingering." Id.

Plaintiff saw Dr. Collins upon his return on June 24, 1999. During this visit, the doctor remarked:

> When I asked the patient about use of alcohol he states he has not had any since he last saw me. He clearly wants Xanax and I pointed out to him that he stated he was "forced to drink six cans of beer" when I saw him on May 26. Today he states that was in the nature of a celebration because his child had been born. He then told me that it was probably both.

Tr. 295. Dr. Collins described Plaintiff's affect as "probably normal" and his speech as normal. Id. Again, Plaintiff did not speak of delusions or demonstrate hallucinations. He had no desire to harm himself or others, and talked of no side effects. Upon his return the following month, Plaintiff started seeing a different doctor.[11] See Tr. 293-94. He began seeing a third doctor in January 2000. See Tr. 285-86. The medical records do not refer to these changes or the reasons therefor.

The ALJ discussed Dr. Collins's progress notes, see Tr. 478, as he is required to do, see SSR 96-7p, 61 Fed. Reg. 34483, 34486 ("All of the evidence in the case record ... must be considered before a conclusion can be made about disability."). There is no indication, however, that he specifically relied upon them in finding Plaintiff was not disabled.[12]

Nevertheless, the ALJ would have been justified in relying on Dr. Collins's opinion. In deciding what weight to be accorded to an opinion, the ALJ's considerations include: if the source has examined the claimant; the source has regularly treated the claimant; and the opinion is related to the source's area of

---

[11] Plaintiff told this doctor that he was having difficulty sleeping, and "[h]e feels that the Xanax which he used to take was helping." Tr. 294.

[12] The ALJ did *indirectly* rely on the doctor's notes in derogation of Dr. Levitt's report and in support of Pantaze's opinion. See Tr. 477 ("comments about possible malingering and/or manipulative behavior ... can be considered"); Tr. 480 ("Those conclusions appear to be supported by the evidence of record including some admittedly limited additional references to possible malingering or manipulative behavior noted by Dr. Collins[.]")

22

specialization.  See 20 C.F.R. §§ 404.1527(d) and 416.927(d).  Dr. Collins saw Plaintiff, three times over the course of three months, in his field of specialty.  Hence, the court finds no merit to Plaintiff's objection.

    4. Expert's Opinion

On October 3, 2002, Dr. Stephen Levitt performed one of Plaintiff's two psychological CEs.  See Tr. 381-87.  Plaintiff maintains that Dr. Levitt found that he was disabled, and the ALJ erred in ignoring this opinion.  But the court finds no statement in Dr. Levitt's report that Plaintiff is "disabled."  Even if there were, however, the ALJ is only required to consider it; he is not bound by such opinion. See 20 C.F.R. §§ 404.1527(f) and 416.927(f).

The ALJ explained, "Dr. Levitt is not a treating medical source and therefore his opinion is not entitled to controlling weight."  Tr. 480.  The opinion of a "treating physician" is generally accorded substantial weight "for it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."  Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983).  See also 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)[.]").  On the other hand, "because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their

opinions." Id. §§ 404.1527(d)(3) and 416.927(d)(3). Accordingly, the ALJ could justifiably rely on the absence of a treating relationship to discount Dr. Levitt's opinion.

Additionally, the ALJ must evaluate the findings of a consultant using "relevant factors" such as "the supporting evidence in the case record, supporting explanations provided by the physician or psychologist, and any other factors relevant to the weighing of the opinions." Id. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii). With regard to Dr. Levitt's report, the ALJ explained,

> [T]he evidence as a whole does not corroborate impairment to [the extent found] and in this regard, the comments about possible malingering and/or manipulative behavior and the general trend towards better mental health . . . can be considered. This is not to say that the claimant has good mental health, but that the claimant's mental health problems are manageable and would not preclude all types of employment[.]

Tr. 477. See also Tr. 480 (" [A]s previously discussed, his conclusions regarding the claimant's ability to work are not supported by the record as a whole and are not persuasive.").

The record supports the ALJ's reasoning. During his mental status examination, Dr. Levitt thought that Plaintiff, although cooperative, appeared "quite uncomfortable," stressed, and depressed. Tr. 383. His affect showed a high level of anxiety. Nevertheless, his thinking was coherent and logical without losing association. Plaintiff was not tangential and, although slightly circumstantial at times, Dr. Levitt said this was not persistent.

24

Plaintiff spoke with a normal rate and rhythm with no pressure of speech or flight of ideas. The doctor detected no auditory or visual hallucinations, or obsessions or compulsions. Dr. Levitt noted that Plaintiff tended to be suspicious and guarded, but he found no ideas of reference, thought broadcasting, thought control, or a systematized paranoid delusional system. Plaintiff was alert and fully oriented. His remote, intermediate, and short-term memory were all intact.

Despite these seemingly benign observations, Dr. Levitt determined that Plaintiff "certainly would have some difficulty and [sic] understanding and remembering to carry out any kind of detailed instructions and probably has some moderate difficulty in making simple work-related decisions[.]" Tr. 384. The doctor also "felt" that Plaintiff had marked difficulty interacting with supervisors, and "believed" that Plaintiff would have a marked impairment in responding to work pressures and changes in a work setting. He concluded:

> I believe a psychiatric disorder is associated with forgetfulness, loss of attention and concentration, a tendency to give up easily, to socially withdraw and overall, he is making a marginal adaptation to his problems at this point in time. He seems to be able to understand and respond with only minimal impairment to relatively simple instructions but would be rather unreliable in performing any routine repetitive tasks with any high degree of accuracy over any extended period of time based on my observations today.

Id.

Dr. Levitt conducted his CE on October 3, 2002, a mere six days after Pantaze conducted Plaintiff's psychological testing. During testing, Pantaze found that

25

Plaintiff had no speech problems. Tr. 391. He exhibited age-appropriate skill with gross and fine motor movements, and his activity level was task-appropriate.

Pantaze easily established rapport with Plaintiff. She found him socially confident, comfortable in his interactions, and talking freely. Plaintiff generally understood instructions readily, exhibited an overall appropriate attitude toward the evaluation, and maintained good interest and effort. His approach to the assessment tasks was orderly, although he was challenged by difficult items. Concentration was good, and Plaintiff was appropriately persistent. He recognized his errors and reacted realistically.

Pantaze observed that testing revealed some elevation in Plaintiff's anxiety. She concluded that his responses to the MMPI-2 "yield a totally invalid profile. All three of the validity scales are significantly distorted," denoting "faking good" repression and denial, and "faking bad" exaggeration. Tr. 392. Pantaze noted that records from Plaintiff's treating professional showed his mental illnesses to be in remission.[13]

There is also evidence in Plaintiff's mental health records to support the ALJ's decision. In July 1999, Plaintiff reported improvement: he was sleeping better, was less irritable and tearful, and his energy was better. Tr. 292. He exhibited better eye contact, smiled sociably, and even joked. In September, Plaintiff was doing "fairly

_____

[13] Stedman's Medical Dictionary defines remission as the "[a]batement or lessening in severity of the symptoms of a disease." Id. at 1548.

well," he was sleeping well, and he was less restless.  Tr. 290.  He was deemed "stable."  Id.

In November, it appeared that Plaintiff's medications were quite satisfactory for sleep and maintaining a calm demeanor without anxiety.  Tr. 288.  The reduction of his anti-psychotic medication had resulted in no extrapyramidal symptoms.  In January 2000, Plaintiff's diagnosis was upgraded.  Tr. 285.

In February, Plaintiff admitted to not taking his Prozac because it interfered with his sexual functioning, and the doctor suspected that Plaintiff was not regularly using the Serzone.  Id.  The following month, the doctor expressed continuing concern about Plaintiff's treatment compliance.  Tr. 284.  By his April visit, however, Plaintiff was sleeping fairly well and was not hearing voices.  Tr. 283.  There was no evidence of either psychotic determinants or anxiety, and Plaintiff appeared to be adjusting to his new son.  Tr. 282.  Plaintiff's return appointment was set up for three months.

At his July appointment, Plaintiff stated that depressed ideas were not a problem.  Tr. 281.  His demeanor was pleasant and no overt anxiety was visible, although accomplishing daily tasks was difficult.  The doctor remarked that "[p]ositive psychotic determinants are absent but the negative traits are numerous," id., but he failed to elaborate on "negative traits."   Plaintiff complained of no continuing hallucinations.

27

Plaintiff again returned after three months.  Tr. 279.  He reported that he had not taken two of his medications for the past month, yet he complained only of not sleeping well.  Plaintiff stated that he had not had any psychotic or even near-psychotic symptoms of a hallucinatory sort in "quite some time."  Id.  He believed that his medication regimen was "sufficing to have him do 'as well as he can.'"  Id.

Plaintiff did "not describe any aspect of his present life which [was] unsatisfying for him."  He reported his daily activities as watching television and doing "bits of housework."  Id.  Dr. L. C. Dekle, who was seeing Plaintiff for the first time, described him as intelligent, alert, pleasant, cooperative, and without any evident dysphoria or psychotic signs.  He decided to decrease Plaintiff's number of medications.

When Plaintiff next saw Dr. Dekle, in January 2001, he was doing well with less medication.  Tr. 278.  Plaintiff believed he was "doing well enough" and had no concerns.  Id.  Dr. Dekle observed that he was more relaxed and at ease, was fully euthymic, and had no evident dysphoria.  The doctor deemed Plaintiff both stable and improved.

After another three-month interval, Dr. Dekle found that Plaintiff had been doing well and "offer[ed] no complaint."  Tr. 276.  Plaintiff was reading again, and taking his medications "faithfully," with no side effects.  Id.  His mood had remained stable, and he suffered no appreciable anxiety.  Dr. Dekle noted that Plaintiff was pleasant, euthymic, and relaxed, and repeated that he was improved and stable.

28

Similar observations were made at Plaintiff's next visit, in July, except that Plaintiff renewed his request for Xanax.  See Tr. 275.

In October, Plaintiff reported that he was doing "'just fine,'" and Dr. Dekle described him as not anxious or depressed.  Tr. 274.  The doctor continued to find him improved and stable.  Because Dr. Dekle decided to reduce Plaintiff's medicinal regimen yet again, he had him to return in ten days.  At that time, Dr. Dekle found that Plaintiff was exhibiting signs of withdrawal, but otherwise he was pleasant, clear-headed, alert, and oriented.  Tr. 273.  The doctor adjusted Plaintiff's medications, adding Alprazolam (Xanax), and again had him return early.

On November 5, 2001, Dr. Dekle noted that the addition of Xanax had "settled [Plaintiff's] nerves quite a bit."  Tr. 270.  Plaintiff felt greatly improved and looked "more settled."  Id.  He was again stable.  A month later, Plaintiff reported feeling more rested and calm.  Tr. 270.  Dr. Dekle mentioned that Plaintiff was "in the process of applying for disability, which he deserves."  Id.  He determined, however, that Plaintiff's mental illnesses were *"in remission."*  Id. (emphasis added).

January's visit found Plaintiff to be "doing just fine," with "no concerns."  Tr. 268.  He did not have his next visit until late April.  See Tr. 342.  Plaintiff denied that he had any active psychiatric symptoms, but Dr. Dekle believed he would nevertheless "qualify for disability on psychiatric grounds, *over the period of time he*

*has had active symptoms.*"[14] Id. (emphasis added).  He was pleasant and euthymic, and showed no aspect of self-destructiveness.  Plaintiff's illnesses were again deemed to be in remission.

In May, his withdrawal symptoms were subsiding, and he denied feeling depressed or suicidal.  Tr. 341.  Dr. Dekle found Plaintiff generally settled, in no particular distress, very attentive, and adding appropriate input.  Again, Plaintiff's medications were adjusted, and he returned in two weeks.  He reported that his sleep, alertness, and ability to concentrate were improved, and his thinking clarified, all with minimal side effects.  Tr. 340.  Dr. Dekle described him as more alert and settled, generally non-distressed, and overall improved.  Tr. 339.  Plaintiff informed the doctor that he was reapplying for disability on psychiatric grounds.  Despite his upbeat records and supposed remission, Dr. Dekle believed he would qualify.

On June 12, despite some concerns, Dr. Dekle noted that Plaintiff was "doing well enough."  Id.  He was pleasant, open to discussion, and worked with the doctor in maintaining "a good therapeutic alliance . . . in his own best interest."  Tr. 338.  Dr. Dekle concluded Plaintiff was "improved."  Id.

---

[14]  Of course, as discussed above, Plaintiff would not be able to receive *any* DIB payments on psychiatric grounds because there is no showing that he was unable to work because of mental illness prior to his DLI.  Even if Plaintiff could establish that he was psychiatrically disabled when he first sought treatment in April 1999 – and the records do not support this conclusion – he could not collect SSI payments before November 2000.

At his next visit, on August 30, 2002, Plaintiff told Dr. Dekle that, at his disability hearing, the ALJ decided to send him to a psychological CE. Tr. 396. It is only then that the doctor paints a gloomy picture of Plaintiff's status:

> The patient is still in limbo, therefore, about just how he will be able to manage going forward. *It seems evident that he will be unable to return to work, as limited as he is by his psychiatric symptoms*, never mind his physical symptoms. Though he has improved somewhat over the course of time I have seen him, his history of psychiatric difficulties stretches back for quite a time before that, and throughout this time, he has been quite impaired in terms of his functional ability.

Id. (emphasis added).

As reviewed above, however, there is *no* support for Dr. Dekle's observation that Plaintiff is limited by psychiatric symptoms, or that Plaintiff's psychiatric difficulties extend much further than when he began treatment in April 1999. Moreover, as early as July 1999, Plaintiff reported improvement, being less irritable and tearful, and with better energy. Tr. 292. On September 1, 1999, he was deemed stable. Tr. 290. By the following April, there was no evidence of psychotic determinants or anxiety. Tr. 283.

By the time Dr. Dekle began treating Plaintiff, in October 2000, he found Plaintiff to be doing well, with no evident dysphoria or psychotic signs. Tr. 279. Thereafter, the doctor worked on reducing Plaintiff's medications. See, e.g., id., Tr. 274. His notes indicate that Plaintiff's condition improved steadily until his illnesses were determined to be in remission. The court therefore upholds the ALJ's

31

determination that, based on the record as a whole, Dr. Levitt's opinion lacks factual support.

### 5. Entirety of Impairments

Plaintiff lastly suggests that the ALJ neglected to consider all of his impairments. He notes that he has respiratory problems for which he uses a nebulizer and a continuous positive airway pressure device. Plaintiff adds that he suffers from sleep apnea, a bipolar disorder, schizophrenia, depression, chronic leg edema, shortness of breath, chronic obstructive pulmonary disease ("COPD"), and recurrent hypokalemia.

The ALJ determined that, prior to Plaintiff's DLI, he suffered from the severe impairment of a history of low back strain. In terms of Plaintiff's SSI application, the ALJ found that Plaintiff suffered from the severe impairments of a history of low back strain, a history of schizophrenia (currently in remission), major depression, anxiety disorder (not otherwise specified), and obsessive-compulsive disorder. As discussed above, however, there is insufficient evidence, as of the ALJ's decision, that any of these conditions were so severe as to prevent Plaintiff from engaging in basic work activities.[15]

---

[15] The regulations define "basic work activities" as "the abilities and aptitudes necessary to do most jobs," including:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;

(continued...)

Case 1:05-cv-00577-NCT-WWD   Document 23   Filed 03/02/06   Page 32 of 34

As to Plaintiff's "respiratory problems," including his sleep apnea, shortness of breath, and COPD, and as to his hypokalemia and leg edema, there is no mention in the transcript of any of these ailments. Apparently, prior to the ALJ's decision, Plaintiff either did not suffer these afflictions or failed to seek treatment for them. The court fails to find any record that Plaintiff was ever diagnosed with bipolar disorder. Accordingly, there is no showing that Plaintiff suffered from any of these impairments to a disabling degree prior to the ALJ's decision.

**Conclusion and Recommendation**

For the foregoing reasons, Plaintiff's motions for miscellaneous relief (Pleadings No. 12, 16, 18, and 21) are DENIED. Further, the decision of the Commissioner is supported by substantial evidence and the correct legal principles were applied. Therefore, IT IS RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED. To this extent, Plaintiff's letter motion (Pleading no. 11) seeking a reversal of the Commissioner's decision should be DENIED,

---

[15](...continued)
(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers and usual work situations; and
(6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b) and 416.921(b).

Defendant's motion to affirm the decision of the Commissioner (Pleading no. 13)

should be GRANTED, and this action should be DISMISSED with prejudice.


_____
WALLACE W. DIXON
United States Magistrate Judge

March 2, 2006

34